STATE OF NEBRASKA, EX REL. C. W. McCOMB, V. CHICAGO,
BURLINGTON & QUINCY RAILROAD COMPANY.

FILED APRIL 7, 1904.   No. 13,478.

1. **Carriers:** DUTIES TO SHIPPERS. It is the duty of a railroad company
to furnish the necessary cars to transport the goods which are
offered to it for carriage, but, when the carrier has furnished
itself with the appliances necessary to transport an amount of
freight which may, in the usual course of events, be reasonably
expected to be offered to it for carriage, taking into consideration
the fact that at certain seasons more cars are needed, it has
fulfilled its duty in that regard, and it will not be required to
provide for such a rush of grain or other goods for transportation
as may only occur in any given locality temporarily or at long
intervals of time.

2. ———: ———. It is the duty of a railroad corporation, both
under the common law, and by statute in this state, to supply
cars to all persons or associations handling or shipping grain,
without favoritism or discrimination in any respect whatever.

3. ———: ———: DISCRIMINATION. During a temporary scarcity of
cars, a railroad company is entitled to consider, in apportioning
cars among grain dealers, their relative volume of business and
facilities for the loading of cars. Though there may be a differ-
ence in the number of cars furnished different grain dealers at
the same railroad station, still, if no favoritism or discrimina-
tion is shown and the number of cars furnished each is in a
fair proportion to his volume of business, facilities for loading
and grain in sight, no shipper has a right to complain of this
difference, though he may not obtain all the cars he deems neces-
sary for his business. /

ORIGINAL application for a writ of mandamus to compel
respondent to furnish facilities for shipping grain. *Writ
denied.*

*Smyth & Smith,* for relator.

*J. W. Deweese* and *Frank E. Bishop, contra.*

LETTON, C.

This is an original application for a writ of mandamus
in this court. On the 22d day of August, 1903, C. W.
McComb, a farmer, living about 4 miles from Wilsonville,

41

in Furnas county, Nebraska, began the business of buying
and shipping grain at Wilsonville in competition with 2
elevators there situated, one owned by S. A. Austin and
the other by the Central Granaries Company, a corpora-
tion. From the day he began business until about Sep-
tember 5, he obtained all the cars from the respondent
necessary for the carrying on of his business. He alleges
in his application that, on or about the 1st day of October,
1903, and on divers dates since then, he requested that the
respondent furnish him all the cars he needed in his busi-
ness or that, if it could not do that, it supply him with 2
cars for each 3 furnished each of the elevators. He al-
leges that the volume of his business is such that he re-
quires 2 cars for each 3 used by each elevator. He says
that it refused to furnish him cars as he required and that,
during the 2 weeks ending October 18, 1903, it supplied
him with only 2 cars, while it supplied the elevators with
23 cars. That he demanded of the respondent a just pro-
portion of the empty grain cars available at Wilsonville,
but that the company, through its agent, declared that the
elevators should have the preference. He avers that such
discrimination will ruin his business, and he prays for a
peremptory writ of mandamus commanding the respond-
ent to furnish him, whenever demanded, with 2 cars to
each 3 furnished each of the elevators; that the respond-
ent be commanded to afford him equal facilities in all
respects with each elevator, and to cease all discrimina-
tion of any kind and character against him in favor of
the elevators.

The answer of the respondent to the alternative writ
alleges, in substance, that there are 2 large and well
equipped grain elevators at Wilsonville; that the relator
McComb has no elevator, shovel house or any convenience
adjacent to the track for loading of grain into the cars;
that, owing to the manner of his loading, he occupies a
whole day for loading 1 car, while the elevators load cars
at the rate of 1 car in 2 hours, and, consequently, the ele-
vators need and can use many more cars than he could

handle. It further says that the demand for cars about the first day of September, 1903, was so great that it was, temporarily, impossible for the company to furnish sufficient cars; that it used every reasonable effort to procure cars and, since it could not obtain all that were demanded at Wilsonville, it adopted the plan of dividing the cars between the 2 elevators and the relator on an equitable and just basis, in accordance with the relative amount of grain handled by the elevators and the relator, and taking into consideration the facilities for handling of grain by each of said shippers. It denies that, during the 2 weeks ending October 18, 1903, the relator was supplied with but 2 cars, while the elevators had 23, but alleges that the relator had 5 cars during this period, while 1 elevator was furnished with 7 and the other with 8 cars. It denies any discrimination between the relator and the elevators, and alleges that, although at the time it was well equipped with the necessary cars for handling the ordinary business coming to the railroad, yet, at that time, the demand for cars in the shipment of grain was unusual, and that, temporarily, all the cars demanded could not be furnished.

It is the duty of a railroad company to provide itself with all the instrumentalities and facilities necessary to carry on the business for which it is organized. It must furnish the necessary cars to transport the goods which are offered to it for carriage, but to this rule there is an exception. When the carrier has furnished itself with the appliances necessary to transport an amount of freight which may, in the usual course of events, be reasonably expected to be offered to it for carriage, taking into consideration the fact that at certain seasons more cars are needed, it has fulfilled its duty in that regard, and it will not be required to provide for such a rush of grain or other goods for transportation as may only occur in any given locality temporarily or at long intervals of time.

In this connection, the testimony of Mr. Calvert, the superintendent of the lines of the respondent west of the

Missouri river, is that the railroad company is well sup-
plied with cars. That at times the cars are so plentiful
that they have difficulty in storing them, and that usually
it has more cars than it needs in taking care of the busi-
ness offered; that a scarcity of cars existed at the time the
relator complains of, and that at the present time cars are
comparatively plentiful. He testifies that frequently, by
the manner of doing business by grain dealers, shipments
are delayed until a certain time when the markets will
justify a quick sale, and this causes a congestion of busi-
ness on the railroad. That he has frequently known on
the Burlington & M. R. R. Co. in Nebraska upwards of
2,000 box cars held for orders up to the 20th of the month,
and by the 26th the railroad company would be probably
that many cars short of being able to fill its orders. That
at times there is a rush and at times there is a dearth of
business, but that the railroad company has enough cars
to take care of the business. These facts are not denied.
Under this state of facts, the complaint of the relator that
the respondent is not sufficiently provided with cars in
order to transact the business of the public does not seem
to be well founded.

Since there was a scarcity of cars during a part of the
period Mr. McComb was in business, what was the duty
of the respondent as to their distribution among those
desiring to ship grain over its line of road?

Part of section 1, article V, chapter 72, Compiled Stat-
utes 1903 (Annotated Statutes, 10007), is as follows:
"Every railroad company or corporation operating a rail-
road in the state of Nebraska shall afford equal facilities
to all persons or associations who desire to erect or
operate, or who are engaged in operating grain elevators,
or in handling or shipping grain at or contiguous to any
station of its road, and shall supply side tracks and switch
connections, and shall supply cars and all facilities for
erecting elevators and for handling and shipping grain to
all persons or associations so erecting or operating such
elevators, or handling and shipping grain, without favorit-

ism or discrimination in any respect whatever.". This provision, so far as it requires railroad companies to supply cars for shipping grain without discrimination, is merely declaratory of the common law. Under this provision, it was manifestly the duty of the respondent to refrain from discrimination between McComb and the 2 elevators in the furnishing of cars for use in the business of buying and shipping grain at the station at Wilsonville. Whether or not this has been done is a question of fact which must be determined from the evidence.

The evidence shows that the elevator and bins of the Central Granaries Company have a capacity of about 10,000 to 12,000 bushels of grain. That the elevator and bins of Mr. Austin have a capacity of about 8,500 bushels. That these elevators and bins are situated close to the railroad track; that the Central Granaries Company have facilities for and can load 8 cars of grain a day; that the Austin elevator can load 10 cars a day. That Mr. Mc-Comb has a bin at his residence, which is about 2 blocks from the railroad track, that holds 2,500 bushels, and that he has rented other bins in the town which in all have a storage capacity of about 7,500 bushels. Upon his farm, about 4 miles from town, he has about 4,500 bushels of grain which were raised on the farm, but this we think should not be taken into consideration upon the question of the volume of his business as a grain dealer. The only means of loading cars which he possesses is by hauling the grain in wagons and shoveling the same into cars. The evidence shows that he has usually loaded 1 car a day, although upon one occasion he loaded 2 cars in that length of time. It appears that both the elevators and Mr. McComb received all the cars they needed up to about the 5th day of September; but afterwards, up to the time of the beginning of the suit, a scarcity of cars existed, in fact, to such an extent that each of the elevators and McComb, also, was compelled to turn away and refuse to buy large quantities of grain— one of the dealers stating that he had turned away 60,000

bushels and the other 50,000 bushels. The only question then necessary for us to decide is as to whether or not, taking into consideration the volume of Mr. McComb's business, his facilities for loading cars, and all the circumstances as compared with the volume of business and facilities of loading of each of the elevator owners, he has been unjustly discriminated against by the respondent, and whether it is the respondent's duty to furnish him with 2 cars for each 3 furnished to each of the elevators.

Mr. McComb began ·business on the 22d of August. Up to the 5th of September, he obtained all the cars that he could use, as did both of the elevators. The scarcity of cars appears to have begun at that time. The evidence shows that from August 22 to September 5, inclusive, Mr. McComb received 8 cars, Mr. Austin 17 and the Central Granaries Company 15. Mr. McComb therefore received one-fourth of the number of cars received by both elevators and, as this was all he wanted, it was presumably the measure of the volume of his business and of his ability to handle grain, with his inadequate facilities as compared with those possessed by the elevators. From the 22d of August to October 20, the day before this action was commenced, Mr. McComb had received 15 cars, Mr. Austin 41 and the Central Granaries Company 34. During the entire period from August 22 to October 20, therefore, Mr. McComb had received exactly one-fifth of the number of cars furnished to both elevators. If we compare the cars furnished during the entire period with that in which each party was supplied with all the cars that could be used in his business, it will appear that McComb received 3¾ cars less during the entire period than he would have been entitled to, if we take his needs during the time from August 22 to September 5 as a fair and just criterion. According to his testimony he could have used more cars than this, but so could each of the elevators. The question is not whether he received all the cars he wanted, but whether the cars on hand were

apportioned in fairness and without unjust discrimination among the 3 grain dealers.

It is clear that an individual loading grain into cars by shoveling the same from wagons, other things being equal, has not the ability to load as many cars in a day as a well equipped elevator, and the testimony in this case clearly shows that the volume of Mr. McComb's business is not such as to require him to be furnished with 4 cars to every 6 furnished to both of the elevators in Wilsonville. It further appears that the railroad company prefers to have the grain shipped from elevators, and that Mr. McComb received something less than his fair proportion of cars, but, under no view of the evidence that we have been able to take, can we say he was at the time this action was begun entitled to the number of cars that he asks. From a statement in the evidence furnished by the agent at Wilsonville, it appears that since the 23d of October inclusive to the 30th of November inclusive, Mr. McComb has been furnished with 23 cars, Austin 44 and the Central Granaries Company 48, which is the exact proportion furnished him before September 5, when he had all he wanted, and from Mr. Calvert's testimony it would seem that the scarcity of cars is now over.

The purpose of a writ of mandamus is to compel something to be done which ought to be done. "The question whether a mandamus should issue to protect the interest of the public does not depend upon a state of facts existing when the petition is filed, if that state of facts * * * has ceased to exist when the final judgment is rendered." *Northern P. R. Co. v. State*, 142 U. S. 492; *State v. Newman*, 25 Neb. 35. The respondent is not discriminating against the relator at this time, and the neglect of duty of which he complains does not now exist. The object of the writ of mandamus being only to compel action, the relator is not at this time entitled to the writ. Although he was not entitled to all he asked for in his application, yet he had cause to complain at the time his action was begun, and, for that reason, it is only just to him that he

should recover his costs herein expended. *State v. Newman,* 25 Neb. 35; *State v. Anderson,* 100 Wis. 523.

He is also entitled to the benefit of his action so far as may be. Since it is a continuing duty on the part of the respondent to furnish him cars without unjust discrimination, and in order to afford speedy relief if this duty is not performed in future, we recommend that the writ be refused at this time, with leave to respondent to apply for the issuance of the same in this case in the future if necessity arises, upon notice to the respondent, and that the costs of this proceeding be taxed to the respondent.

DUFFIE and KIRKPATRICK, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the writ of mandamus applied for is refused, with leave to respondent to apply for the issuance of the same in the future if the necessity arises, upon notice to the respondent. It is further ordered that the costs of this proceeding be taxed to the respondent.

WRIT DENIED.