STATE OF NEBRASKA, EX REL. WILLIAM J. CRANDALL, V. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY.

FILED OCTOBER 20, 1904. No. 13,539.

1. **Common Carriers: DUTIES TO SHIPPERS.** A common carrier of goods is required to provide facilities for and to receive and ship goods tendered at its stations on payment or tender of the usual tariff rates, and has no right to discriminate or favor one shipper over another in rates or facilities.

2. ———: ———. But this general principle is subject to the modification that if the carrier has furnished itself with cars sufficient to carry the freight which may reasonably be expected to be offered for carriage, taking into consideration the fact that at certain seasons more cars are needed, it has exercised due diligence in that regard, and where through causes which are not within its control it cannot supply the cars temporarily made necessary by unusual demand therefor, it is entitled to apportion the same in a fair and equitable manner among its patrons, and cannot be compelled to provide one shipper with cars to the exclusion of others.

3. **Evidence.** Under the facts set forth in the opinion, *held*, that no unjust discrimination has been proved, and that the relator is not entitled to the writ of mandamus prayed for.

ERROR to the district court for Lancaster county: ED-WARD P. HOLMES, JUDGE. *Affirmed.*

*H. F. Rose,* for plaintiff in error.

*J. W. Deweese* and *Frank E. Bishop, contra.*

LETTON, C.

This is an application for a peremptory writ of mandamus to compel the respondent to furnish and deliver to relator sufficient freight cars to enable him to ship all grain and mill products offered for shipment at the railroad station of the respondent at Firth, Nebraska, and to compel the respondent to furnish equal facilities and privileges to the relator in the matter of providing cars for the shipment of grain that are given to his competitor in business, the Farmers' Grain & Lumber Company.

William J. Crandall, the relator, now is and has been engaged, for a number of years, at the town of Firth, Lancaster county, Nebraska, in operating a mill and elevator, and of buying, selling, and shipping grain and mill products. A few years ago The Farmers' Grain & Lumber Company was organized by a number of farmers residing in that locality for the purpose of dealing in grain, and ever since this corporation began business sharp competition has existed between the respective grain dealers. Both of these parties occupy elevators situated upon the line of railroad of the respondent. It appears that in the early part of 1903 a shortage of cars existed on the lines of the respondent, and that it was compelled to apportion the cars available at that time between the grain shippers operating upon its lines of railroad, and it further appears that during this time the respondent had furnished cars in equal numbers to the rival grain dealers at Firth for the shipping of grain, upon the theory that, as a grain dealer, Crandall was entitled to an equal number of cars with the Farmers' Grain & Lumber Company, and, in

addition thereto, as a miller, he was entitled to whatever cars he could use and the railroad could furnish for the purpose of shipping his mill products; but that, since the mill products were for the most part destined to southern points, foreign cars were furnished him specially for such shipments. Under this arrangement, Mr. Crandall, from the 1st of December, 1902, to the 12th of February, 1903, had been furnished in all 102 cars, while the Farmers' Grain & Lumber Company had been furnished 47. After the 12th of February, 1903, the railroad agent at Firth, Nebraska, was instructed by C. B. Rogers, the division superintendent, that after that date the railroad company would furnish Mr. Crandall cars for flour, bran and straight car loads of corn meal as mill products, and then divide the remainder of the available cars evenly between Crandall and the Farmers' Grain & Lumber Company, and that under this ruling mixed car loads of corn meal, chop, cracked corn and sack corn would be counted at their capacity as cars loaded with grain.

It would seem that the moving cause of this order was the fact that a complaint had been made by the Farmers' Grain & Lumber Company to the railroad company that Crandall was obtaining more than his share of cars by reason of his shipping chop and cracked corn as mill products, when they ought of right to be counted as grain in the division of cars, and thus that the Farmers' Grain & Lumber Company was being unduly discriminated against in the apportionment of cars furnished. Following the making of this order, whenever Crandall shipped a car load of chop or of mixed chop and sack corn or oats, the agent at Firth furnished a like capacity of cars to the Farmers' Grain & Lumber Company for the shipment of grain, and out of this order and the action of the agent of the railway company in accordance therewith this controversy takes its rise.

It is apparent from the whole testimony that the officers of the railroad company endeavored to fairly and equitably apportion cars for the shipment of grain between these

contending parties.   The determination of the question at issue depends almost wholly upon whether the article of commerce which is termed "coarse meal" or "chop" by Mr. Crandall, and is denominated "cracked corn" by the respondent and the Farmers' Grain & Lumber Company, should be considered as grain for the purpose of the apportionment of cars or should be classed as a mill product. If this article is handled and dealt in by grain dealers and elevator proprietors, and is not known under the custom and usages of the trade as a mill product or meal, then the Farmers' Grain & Lumber Company would be entitled, under the rule adopted by the respondent, which seems to be fair and reasonable, to an equal capacity of freight cars for shipment of grain to those used by Mr. Crandall in the shipment of this product; whereas, if this article falls properly and legitimately under the head of mill products, and is to be considered as a manufactured article, Crandall would be entitled to such cars as the railroad could furnish him to use in his milling business, including the shipment of this product, and, in addition thereto, with as many cars for grain shipments as were furnished to his competitor.   A sample of this product taken from a sack in a car loaded by Mr. Crandall was in evidence in the district court, and is attached to the bill of exceptions in this case.   A number of witnesses engaged in the elevator and grain dealing business testified that this article was what is known in the trade as "cracked corn"; that it is manufactured simply by crushing the corn between rollers, and is not cleaned or bolted in any manner, the resulting product being the same as that produced by the ordinary farmers' feed mill; while Crandall testifies that it is properly known as "coarse corn meal," though admitting that it is so produced.   It seems also that in the southwestern tariff sheet a higher rate is charged for corn chop than for corn, and that on respondent's system "chop" is classified as a separate item. It is therefore contended by Crandall that this product is not properly shipped as grain but as a mill product.

38

Should the "chop," "cracked corn" or "coarse meal," as it is variously termed, be regarded in the distribution of cars as a grain or as a mill product? This question is not free from doubt. It is shown that a number of elevators in this state which do not do a milling business have had a demand from their customers for cracked corn for feeding purposes, and that to meet this demand they have installed roller machinery for the purpose of cracking the corn, and that the article thus manufactured is handled and sold as other corn by grain dealers. On the other hand, it is shown that Mr. Crandall has installed expensive machinery at his mill for the purpose of manufacturing corn meal. But it is also shown that in the manufacture of corn meal for culinary purposes the corn is first kilndried, then cracked or ground between rollers, and afterwards bolted, and that in the manufacture by him of this "coarse meal" or "cracked corn" the same rollers are used, but they are set farther apart so as not to crush the grain so finely; that the corn is not kilndried and the product is not bolted. The corn is merely passed between the rollers and from there loaded into the car. After examining the sample attached to the bill of exceptions and considering the evidence in the case, we are convinced that this substance properly belongs under the head of "cracked corn" or "chop," and is not in the ordinary acceptation of the term "meal"; and we are further convinced from the testimony that under the usages of the trade the article is properly handled by grain dealers as well as millers. Taking this view of the facts proved we are of the opinion that the distribution of cars as made by the respondent was not unfairly discriminative against the relator, but that, in view of all the circumstances, he has no reason to complain upon that ground.

The record shows that considerable ill feeling exists between some of the members of the Farmers' Grain & Lumber Company and Mr. Crandall, and that certain charges and complaints had been made to the railway company that Crandall had been shipping grain under

the guise of mill products by covering part of the contents of the car and thereby obtaining more than his share of cars. We are convinced, however, that these charges are not warranted by the evidence and that Crandall was honest and sincere in his opinion that as a miller he was entitled to all the cars the railroad could furnish for his use in shipping all kinds of mill products, including therein "cracked corn," and that as a grain dealer he was entitled to an equal number of cars with his competitor, excluding cars used for "cracked corn," "chop," etc. We are further convinced that no intention on the part of the respondent's agents or officers to discriminate unfairly against Mr. Crandall has been shown, and that they have been placed in the difficult position of trying to do business with two active and jealous competitors in such a manner as to remain upon good terms with both, a task almost beyond human power.

"How happy could" they "be with either,
Were t'other dear charmer away!"

The brief of the relator is largely devoted to the proposition that a common carrier of goods is required to provide facilities for and to receive and ship goods tendered at its stations on payment or tender of the usual tariff rates; that it has no right to discriminate or favor one shipper over another in rates or facilities and that such duties of common carriers are enforceable by mandamus. With this proposition we agree. Since the briefs in this case were filed, the case of *State v. Chicago, B. & Q. R. Co.,* 71 Neb. 593, has been decided by this court. That decision is in accord with the principles contended for by relator, but with the further qualification that, when the carrier has furnished itself with the appliances necessary to transport the amount of freight which may in the usual course of events be reasonably expected to be offered to it for carriage, taking into consideration the fact that at certain seasons more cars are needed, it has fulfilled its duty in that regard, and it will not be required to provide for such a rush of grain or other goods for transportation as may

only occur in any given locality temporarily, or at long intervals of time. It appears that ordinarily the respondent has cars enough to meet the usual requirements of shippers, but that, owing to the long coal strike in the east, conditions had been abnormal, and the railroad company had at this time been unable to have returned to its line a large number of its cars which had been sent to points upon other railroads, and that it had found it necessary to impose an extra charge in the nature of a per diem for cars which were retained by other lines for more than 30 days, with the purpose of procuring an expeditious return of the cars. That owing to this scarcity it was impossible to furnish at this time all the cars necessary for use, not only by the relator, but by all other grain shippers along its lines in this state. Under this state of facts, the modifying principle above quoted applies, and if no unjust discrimination appears, no shipper has the right to complain because he has not been able to obtain carriage for all the goods which he may desire transported.

We are of the opinion that no failure of duty or unjust discrimination has been shown upon the part of respondent, and that the judgment of the district court should be affirmed.

AMES, C., concurs.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.