PETERSON & HOWE, APPELLEE, V. JAMES C. DAVIS, DIRECTOR
GENERAL, APPELLANT.

FILED NOVEMBER 26, 1923.   No. 22582.

1. Carriers: NEGLIGENCE: QUESTION FOR JURY.   Evidence examined,
and *held* that the question of defendant's negligence in furnish-
ing cars for a shipment of cattle was for the jury.

2. ————: DELAY IN SHIPMENT: MEASURE OF DAMAGES.   Where,
upon order of the shipper, cattle were unloaded and held for
several days to condition them and await a favorable market,
it was error to instruct the jury that the measure of damages
was the difference between the market value when they finally
arrived and when they would have arrived had the carrier
furnished cars seasonably.   The true measure in such case is
the difference in value between the date they should have ar-
rived if the carrier had not been negligent, and the date they
would actually have arrived had the trip not been interrupted
by order of the shipper.

APPEAL from the district court for Rock county: ROBERT
R. DICKSON, JUDGE.   *Reversed.*

*Wymer Dressler, Robert D. Neely* and *Paul S. Topping,*
for appellant.

*M. F. Harrington* and *Gerald F. Harrington, contra.*

Heard before MORRISSEY, C. J., LETTON and DAY, JJ.,
REDICK, District Judge.

REDICK, District Judge.

This is an action brought against the director general of
railroads to recover damages to a shipment of cattle from
Bassett, Nebraska, to Omaha, Nebraska; the plaintiff being
a partnership composed of C. L. Peterson and Frank Howe.
The facts upon which the claim of plaintiff is based are sub-
stantially these:   Early in November, 1919, plaintiff noti-
fied defendant's agent at Bassett that he desired to ship nine
car-loads of cattle to South Omaha on the 30th day of No-
vember, and the order was entered by the agent upon a
sheet kept for that purpose.   Plaintiff's home place was
about 13 miles from Bassett, but the cattle in question were

kept at a ranch about 18 miles from the home place. Early on the morning of Friday, November 28, 1919, Howe called up the agent over the telephone and asked if the cars would be ready on the 30th. The agent said he would find out a little later, and about 8 o'clock telephoned that the cars would be ready. Thereupon Howe started on horseback to the ranch for the purpose of bringing the cattle in, and returned with them—about 240 head—arriving at the home place about 6 in the evening. After Howe's departure the agent called up and notified Mrs. Howe that the cars could not be furnished on the 30th, and not to bring the cattle in. Mrs. Howe had no means of communicating this information to her husband, but imparted it to him upon his arrival with the cattle in the evening. The weather on the morning of the 28th was very cold and some snow fell during the day, and that night and the following day reached the proportions of what in this country is termed a "blizzard." Howe kept the cattle at the home place Friday night, Saturday, and Saturday night, feeding them hay, and on Sunday drove them to Bassett, a distance of 13 miles. The blizzard continued, and it was necessary to break the way for the cattle with a sled. Arriving at Bassett that evening he found the railroad stock-yards not in condition for keeping the cattle, and made arrangements with a liveryman to take charge of them and feed them, his herd remaining, however, in an open lot connected with the livery stable. His idea in taking the cattle to Bassett was to have them there in case the cars could be furnished within a few days, and he testifies that the expense of keeping them at Bassett was no more than it would have been at the home place where he did not have sufficient feed to keep them any length of time. The next morning he inquired of the agent when he could have cars, and, getting no definite information, telephoned the train dispatcher at Norfolk, stating the position he was in, and during that day nine cars were started for Bassett, but, owing to a breakdown of the engine, were delayed and did not reach there until Tuesday night. The cattle were loaded Wednesday morning, De-

cember 3, and started for Omaha at 1:35 p. m., but by order
of Howe indorsed upon the bill of lading the cattle were
unloaded upon their arrival at Fremont at 6:25 a. m., De-
cember 4, and were kept in the stock-yards until December
8, when at 9:45 p. m. three cars were forwarded to Omaha,
and 5:30 a. m., December 10, three more cars, and at 10:30
p. m., December 10, the remaining three cars were forward-
ed to Omaha, where they arrived in due time, and 224 head,
the number in issue here, were sold on the market at an
average of about $7.15 per cwt.

Plaintiff claims the cattle were of the class known to the
trade as "good to choice," and that if they had arrived on
December 2, as they should have done if shipped on No-
vember 30, they would have brought from $8.25 to $8.50
per cwt., and claims a loss of over $3,000 on account of the
cattle dropping from the class "good to choice" to the class
known as "fair to good," between which there appears to
have been a spread of about $1.50 per cwt. in the market
price. Plaintiff also claims $1,900 damages on account of ex-
cessive shrinkage of the animals from the time they arrived
at Bassett until their arrival in South Omaha. Other claims
for feed and expenses at Bassett and at Fremont were made
in the petition, but need not be considered further. Plain-
tiff remitted all damages in excess of $3,000, for which he
prayed judgment. The answer of the defendant was a
general denial.

The case was submitted to a jury, and at the close of all
the evidence both parties moved the court for a diretced
verdict; the plaintiff, however, requesting the question of
damages to be submitted. The court sustained the motion
of plaintiff and instructed the jury to find for the plaintiff
for such amount of damages as the evidence showed plain-
tiff had suffered by reason of negligence of the defendant,
the measure of which damages was stated in the following
language:

"You will consider the loss in weight of the cattle, if
any, and the drop in the market; but the real test of the
measure of damages is this: The difference in the market

value of the cattle at the time they reached South Omaha and what their market value would have been if they had reached it at such earlier time as you should find that they would have reached South Omaha if the director general had furnished the cars at the time they were ordered to be furnished on November 30, or as soon thereafter as they could have been furnished by the exercise of proper care by the director general. But the amount of your verdict cannot exceed $3,000 and interest thereon at 7 per cent. per annum from December 2, 1919."

The jury returned a verdict for $3,000 and interest, upon which judgment was rendered, and defendant's motion for new trial having been overruled, he brings the case here for review, assigning as error the directing of the jury to find for the plaintiff, and refusal of defendant's request to find for the defendant, and that the verdict is not sustained by sufficient evidence either as to liability or amount.

The petition is somewhat voluminous and full of repetition, and might be considered as declaring for breach of contract to deliver cars or as an action for damages for failure to furnish cars, but we understand the plaintiff to adopt the latter interpretation at this time, and that view will save some confusion as the measure of damages is substantially the same in both cases. Defendant's brief is taken up very largely with the discussion of the power of the agent, while the railroads were under federal control, to enter into a contract to furnish cars at any certain date, as involving a discrimination between shippers, and cites a number of authorities which seem to sustain his position that such power does not exist, but viewing this action, as we do, as one founded upon negligence, we do not deem it necessary to discuss that question.

The real questions for decision are, first, whether the evidence is sufficient to support a finding of negligence on the part of defendant; and, second, whether the evidence is sufficient to support the verdict of the jury as to the amount of damages, which involves the consideration of the instruction as to the measure of damages above quoted, and we will discuss these questions in their order.

The excuses presented by defendant for the failure to furnish cars on November 30 are that there was a general shortage of cars in the country and in the division of the Northwestern railroad in which Bassett was situated; that there had been a tremendous increase in stock shipments on said division, the season's quota in 1918 having been 9,000 cars, and in 1919, 16,000 cars; that it was common knowledge and particularly known to plaintiff, and this is conceded, that it was very difficult to procure cars at any specified date, and that shippers in most instances were required to wait 2 or 3 and up to 30 days for cars. These facts are abundantly supported by the evidence, but it seems to us they do not adequately meet the situation. The agent and dispatcher of defendant testified that cars were furnished Bassett, according to the ordinary rules governing in cases of shortage, as promptly as they could be furnished without interfering with the just demands of shippers at other points; but the fact remains that for at least 20 days prior to November 30 they had recorded on their order sheet a request for cars for that date, and defendant offered no evidence as to the number of idle cars, if any, at Norfolk, West Point, or other division points during the 20 days, and which might have been available for plaintiff's use if a reasonable effort had been made in that behalf. All these facts were peculiarly within the knowledge of the defendant, and on cross-examination the dispatcher at Norfolk and the superintendent of the division were inquired of as to the number of idle cars at Norfolk during that period, and the dispatcher answered that he could not tell off-hand, and the superintendent that he had no way of knowing. The law covering the duty of the carrier to furnish cars is fully stated in *State v. Chicago, B. & Q. R. Co.*, 72 Neb. 542, cited by defendant, and it is there held:

"Where through causes which are not within its control it cannot supply the cars temporarily made necessary by unusual demand therefor, it is entitled to apportion the same in a fair and equitable manner among its patrons,

and cannot be compelled to provide one shipper with cars to the exclusion of others."

But, as we have suggested, the evidence in this case is not of such a character as to require a finding that the failure to furnish cars on the 30th was occasioned by causes beyond the control of the carrier. The question here is not of equitable distribution; sufficient facts are not in evidence upon which to base a conclusion. It is rather whether defendant exercised reasonable care to furnish cars on the 30th. The mere existence of a general shortage, not connected up with the particular situation by evidence of facts supposedly within the knowledge of the carrier specially relevant thereto, is not sufficient to excuse the carrier as a matter of law. Defendant contends that "a shipper who is expressly notified of a car shortage and who has knowledge thereof and is instructed to not bring his cattle to the station for shipment, until further notice, cannot recover based upon alleged delay in furnishing cars." This may be conceded as a general proposition, but in this case notice was not received until the cattle had been started, and whether plaintiff acted as a reasonably prudent man in completing the journey under the circumstances was for the jury. We think in this condition of the evidence, in connection with other facts shown, it presented a question of fact for the lower court, with whose finding we do not feel warranted in interfering.

The instruction upon the measure of damages and the evidence upon that subject present questions requiring serious consideration. The jury were told that "the measure of damages is this: The difference in the market value of the cattle *at the time they reached South Omaha* and what their market value would have been if they had reached it at such earlier time" as the director general in the exercise of ordinary care should have furnished the cars. It will be remembered that at the request of the shipper the cattle were unloaded at Fremont on the 4th and detained there until the 9th and 10th. Now, if the cars had been furnished on the 30th, the cattle would have arrived in

Peterson & Howe v. Davis.

South Omaha December 2; and if they had not been unloaded at Fremont, they would have arrived on the 4th. It would seem, therefore, that the market value on the 2d or the 4th would furnish one term of the comparison rather than the 10th or 11th, the days they did arrive, the delay being occasioned by the order of the shipper. Evidence of the market reports was introduced covering only the 1st, 2d, and 10th days of December, though plaintiff testified that the market gradually dropped after the 1st. If the drop was continuous, it was lower on the 10th than on the 4th, and defendant by this instruction would be charged with a greater loss than lawful. However, the evidence as to the condition and weight of the cattle at the ranch at Bassett and Fremont is quite unsatisfactory. Peterson, one of the plaintiffs, testified that he saw the cattle in July and August of 1919 on the ranch; that he was able to give a fair estimate of the weight of the cattle from seeing them, and that in his judgment the cattle in question would average 1,100 pounds. He was frank enough to admit, however, that he would not be willing to purchase cattle upon his judgment as to their weight. Howe, the other plaintiff, testified that the cattle would shrink about 50 pounds on the trip from the ranch to the home place but recover it while they were there; that they would shrink 50 pounds on the drive from the home place to Bassett and 50 pounds on the trip of 250 miles from Bassett to Omaha. He also testified that in his judgment, upon the arrival of the cattle at Bassett, they would average 1,050 pounds a head, but that, owing to the conditions under which they had to be held, they went down every day until they were shipped. The average weight of the cattle when sold upon the Omaha market was 951 pounds. There was no evidence as to the weight of the cattle upon their arrival or departure from Fremont.

The only items submitted to the jury for their consideration on the question of damages were the difference in market and the excessive shrinkage. Assuming that the cattle averaged 1,050 pounds upon arrival at Bassett, and de-

ducting 50 pounds as the ordinary shrinkage during a continuous trip to Omaha, the cattle upon arrival should have averaged 1,000 pounds, and consequently the maximum shrinkage would be 49 pounds a head, or 10,076 pounds. Was all of this chargeable to defendant on account of a negligent delay of three days in furnishing cars? Was any of it caused by the delay at Fremont on order of the shipper? There is no evidence as to the condition of the cattle upon arrival at or departure from Fremont. The evidence for plaintiff is to the effect that the stop was to improve the appearance of the cattle by resting them up, and the main purpose was to avoid arrival on Friday or Saturday, when market conditions were usually unfavorable. Peterson testifies, notwithstanding they had rest and good feed at Fremont, upon arrival at Omaha "they were sort of dead like * * * look like they had gone through quite an ordeal, hadn't had much feed or something of that kind," "looked gaunt," "don't know," but would class them about "fair to good." When asked, "Well, what reason have you for the cattle looking gaunt when fed four or five days immediately before leaving Fremont?" he answered, "Because the weather was awful bad." "Then, it was the weather?" "Well, the weather had something to do with it." How much of the gaunt appearance was due to the bad weather? The evidence is silent on this point.

The defendant cannot be charged with losses due to bad weather. If plaintiff can hold his cattle 5 days to condition them or to await a favorable market, why not 10 or 30 days. If plaintiff had held his cattle at Fremont until December 20, an instruction that the difference in market between the date they should have arrived and the 20th could not be sustained. The instruction stated an incorrect measure of damages; and the judgment is reversed.

REVERSED AND REMANDED.